United States District Court
Southern District of Texas

**ENTERED**

December 12, 2022
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **FRANCISCO MORENO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:20-CV-02311** |
| | § | |
| **BILL NELSON, ADMINISTRATOR** | § | |
| **NATIONAL AERONAUTICS AND SPACE** | § | |
| **ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

### ORDER

Pending before the Court is the Motion for Summary Judgment filed by Defendant Bill Nelson Administration, National Aeronautics and Space Administration ("Defendant" or "NASA"). (Doc. No. 23). Plaintiff Francisco Moreno ("Plaintiff" or "Moreno") responded in opposition (Doc. No. 26), and Defendant replied in support. (Doc. No. 27). After reviewing the relevant briefing, summary judgment evidence, and the applicable law, the Court **GRANTS** Defendant's Motion.

### I. Background

This is an employment discrimination case. Plaintiff, a Hispanic male in his 60's, works at NASA as an aerospace engineer in the exploration development integration office in a GS-14 position. He has worked there for over 29 years. Moreno states that, throughout the years, he has applied for multiple promotions, but NASA has continuously denied him the opportunity to advance to a GS-15 position.

Most recently, Moreno applied for two jobs: technical management subject matter expert for Mission Preparation and Execution ("MPE") and technical management subject matter expert for Mission Integration and Analysis ("MIA"). Moreno contends that he was qualified for both

positions, but NASA did not choose him because of his "race, age, gender, national origin and/or color." (Doc. No. 1 at 5). On the other hand, Defendant argues that it did not discriminate and that the chosen candidates were better suited for the positions.

Moreno brought this case under Title VII and the Age Discrimination in Employment Act ("ADEA"). NASA filed a Motion for Summary Judgment, contending that it had a legitimate, nondiscriminatory reasons for not promoting Moreno and that Plaintiff cannot meet its burden of showing that NASA's reasoning is merely pretext.

## II. Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point

the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

### III. Analysis

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Age Discrimination and Employment Act ("ADEA") prohibits an employer from discriminating on the basis of age. *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 473 (5th Cir. 2015). A party can establish Title VII discrimination or discrimination under the ADEA through either direct or circumstantial evidence. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Where, as in this case, the plaintiff's case is built upon circumstantial evidence, a court relies upon the *McDonnell Douglas* framework for its analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In *McDonnell Douglas*, the Supreme Court outlined a three-part framework to analyze a discrimination claim. First, the plaintiff must establish a *prima facie* case of discrimination. *Id.* If the plaintiff does so, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer provides a legitimate, nondiscriminatory reason for the employee's rejection, the burden shifts back to the plaintiff to prove that the employer's reason was pretext for discrimination. *Id.* at 804–05.

The Court will evaluate each part in turn, beginning with Moreno's prima facie case of discrimination.

**A.     Moreno's Prima Facie Case of Discrimination**

The *McDonnell Douglas* framework first requires Moreno to establish a prima facie case of discrimination. Under Title VII, a prima facie case of discrimination based on disparate treatment requires a showing that the plaintiff: (1) is a member of a protected class, (2) was qualified for the position at issue, (3) was the subject of an adverse employment action, and (4) was treated less favorably because of his or her membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015).

Both parties agree that Plaintiff established a *prima facie* case for discrimination under Title VII and the ADEA. (Doc. Nos. 23 at 5, 26 at 1). This point, therefore, is not contested.[1] Thus, the Court moves on to the subsequent prongs of the *McDonnell Douglas* analysis.

**B.     NASA's Legitimate, Non-Discriminatory Reason for Not Selecting Moreno for the MPE and MIA Positions.**

NASA argues that Moreno's Title VII and ADEA claims must fail because it has presented a legitimate, non-discriminatory reason for not selecting Moreno. (Doc. No. 23 at 9). "An employer may avoid liability for . . . discrimination . . . by producing evidence tending to show that it had a legitimate, nondiscriminatory reason for its disputed decision." *Patrick v. Ridge*, 394 F.3d 311, 316 (5th Cir. 2004). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).

NASA primarily contends that its legitimate, nondiscriminatory reason for not selecting Moreno was that the other candidates "demonstrated better soft skills." (Doc. No. 23 at 9). That is,

---

[1] The Court notes that, except as noted in this opinion, the summary judgment evidence does not provide the age, race, color, religion, or national origin of the other candidates. That said, both parties seem to agree that Moreno has satisfied a prima facie case, so the Court will assume the requirements are met as well.

4

the other candidates "were shown to be better communicators, team builders, and better leadership skills [sic]." (Doc. No. 23 at 9). NASA supports its conclusion in part by describing its selection process. As NASA explains, there are multiple steps in the process. First, the positions are posted. Next, Human Resources (HR) performed an initial screening of the applications based on the position description and a job analysis with defined skills and specialized skills from resumes in the USAJobs database. (DiGiuseppe Decl., Doc. No. 23-1 at 2). A few weeks later, an HR employee provided Michele DiGiuseppe ("DiGiuseppe") with two certificates of eligible candidates for the MIA Position—one certificate was for Competitive Certification, which included eight candidates who were GS-14s, and the other certificate was for Non-Competitive Certification, which included two candidates that were GS-15s. (DiGiuseppe Decl., Doc. No. 23-1 at 2). HR also provided DiGiuseppe with a panel of the qualified applicants for the MPE position. There were fewer than ten candidates on the MPE certification, but the Court cannot discern from the record the exact number. (Sarafin Dec., Doc. No. 23-3 at 2). DiGiuseppe is the deputy manager/supervisor for the Aerospace Technologists and was the hiring manager for the open MPE and MIA positions. (DiGiuseppe Decl., Doc. No. 23-1 at 1). After receiving the certificates, DiGiuseppe created an interview panel that consisted of Wayne Jermstad ("Jermstad"), Michael Sarafin ("Sarafin"), and herself. (DiGiuseppe Decl., Doc. No. 23-1 at 3). Jermstad is the Deputy Director of the Cross Program System Integration. Sarafin was employed as a Mission Manager.

DiGiuseppe went on leave for a period of time. During her absence her supervisor, Burt Laws, Jermstad, and Sarafin held a meeting in which they selected the three candidates to interview per position. (DiGiuseppe Decl., Doc. No. 23-1 at 4). In making this decision, Laws, Jermstad, and Sarafin looked to the selection criteria. (DiGiuseppe Decl., Doc. No. 23-1 at 4). The criteria required the candidate to have a Human Spaceflight Operation background, Mission Integration

experience, and experience with the Exploration Systems Development (ESD) Exploration Missions. (DiGiuseppe Decl., Doc. No. 23-1 at 3). Moreno was chosen as an interview candidate for both positions.[2]

DiGiuseppe returned from leave and along with Jermstad and Sarafin, interviewed the selected candidates. According to DiGiuseppe and Jermstad, Moreno was asked eight questions that were based on the job description and analysis for the positions. (DiGiuseppe Decl., Doc. No. 23-1 at 3); (Jermstad Decl., Doc. No. 23-2 at 2).[3]

No formal scoring or ranking was used during the interviews. (Jermstad Decl., Doc. No. 23-2 at 3). Rather the panel members wrote down their notes after each question. At the end of the interview, the Panel discussed the candidate's strengths and weakness. (Jermstad Decl., Doc. No. 23-2 at 3). Specifically, the Panel looked for candidates "who demonstrated (1) technical competencies in Human Spaceflight Operations, Mission Integration, and experience with the Exploration System Development (ESD) Exploration Missions; and (2) effective communication, negotiation and team building skills." (DiGiuseppe Decl., Doc. No. 23-1 at 2).

As stated earlier, the Panel selected Moreno as an interview candidate for both the MPE position and MIA position, but ended up choosing other candidates. The Court will consider NASA's legitimate, non-discriminatory reasons for selecting other applicants, addressing the MPE position first.

---

[2] There were only four total candidates for the two positions because Moreno and another candidate applied for and were chosen to interview for both positions. (Sarafin Dec., Doc. No. 23-3 at 3).
[3] Shull and Merancy were only asked six questions because they were only interviewing for one position. (Sarafin Dec., Doc. No. 23-3 at 3). The Panel tailored the questions for Moreno so that he would only have to interview once, but, as a result, the questions covered both positions. (Sarafin Dec., Doc. No. 23-3 at 3).

### *1.      MPE Position*

Defendant selected Sarah Shull ("Shull") over Moreno for the MPE position. Ms. Shull is a Caucasian female. The briefs do not reveal her age, nor do they focus on the details of the other candidate who was not chosen.

All interview panelists, as recounted in their declarations, agreed that Moreno and Shull had comparable technical competencies. (DiGiuseppe Decl., Doc. No. 23-1 at 3); (Jermstad Dec., Doc. 23-2 at 3); (Sarafin Dec., Doc. No. 23-3 at 4). Moreno points to DiGiuseppe's deposition, arguing Shull did not perform "some of the job duties" that Moreno had performed. (DiGiuseppe Dep., Doc. 26-1 at 31:15-32:5). DiGiuseppe's deposition makes clear that before applying for the promotion, Shull and Moreno did not perform identical duties but, but that did not change the fact that their technical competencies for the MPE position were comparable.[4] On the other hand, one panelist, noted that while Moreno met the technical criteria, he did not demonstrate as diverse work experience as Shull, a factor she highlighted in her interview by describing her past work and projects. (Sarafin Dec., Doc. No. 23-3 at 4).

With respect to effective communication, negotiation, and team building skills, however, all panelists concluded that Shull surpassed Moreno. Sarafin stated that Moreno was not the top candidate for the MPE position because his responses were more focused on process, schedule, and mission. (Sarafin Dec., Doc. No. 23-3 at 3–4). Moreno did not discuss the relational aspects of working with teams, nor did he present evidence of how he used his soft skills to accomplish technical tasks, while Shull did. (Sarafin Dec., Doc. No. 23-3 at 3–4). Jermstad also explained that

---

[4] Moreno's attorney specifically asked DiGiuseppe in her deposition, "[h]as any of the other applicants performed those duties in the same subject matter? *Not* that it may be, you know, *similar*." (DiGiuseppe Dep., Doc. 26-1 at 31:21-25) (emphasis added) (discussing Moreno and Shull's previously performed duties).

7

Moreno was not selected because the communication, leadership, and team building skills he demonstrated "were inferior" to those of Shull. (Jermstad Dec., Doc. 23-2 at 3). Lastly, DiGiuseppe expressed the same sentiment as the other panelists—"I did not select Mr. Moreno for the position based on his lack of demonstrated team building and effective two-way communication." (DiGiuseppe Decl., Doc. No. 23-1 at 4). "For example, Mr. Moreno is very directive/blunt in his communication style versus soliciting input, listening, and consensus building." (DiGiuseppe Decl., Doc. No. 23-1 at 4).

At the completion of the interviews, all three panelists believed that Shull was the right fit for the MPE job. (*See* Jermstad Dec., Doc. 23-2 at 3; Sarafin Dec., Doc. No. 23-3 at 3; DiGiuseppe Decl., Doc. No. 23-1 at 3). Conversely, during the Panel's discussion about the interviews, it also reached a consensus that "Mr. Moreno was not the top candidate for this position." (Sarafin Dec., Doc. No. 23-3).

Plaintiff argues that Defendant failed to prove a "specific, clear, and individualized explanation" for why its selecting official assigned their respective ratings or scores. (Doc. No. 26 at 6). Plaintiff claims that NASA only "provided vague and unspecific reasons relating to what it termed 'soft skills.'" (Doc. No. 26 at 6). Further, Moreno argues that his accomplishments are "a strong indication that the duties he was performing that matched the job announcement for the positions were performed at the highest level." (Doc. No. 26 at 7). As outlined above, NASA provided the Court with specific, nondiscriminatory reasons why it selected Shull over Moreno. Additionally, Plaintiff's contentions about his accomplishments did not go unrecognized. He was one of the two individuals out of all the candidates that was chosen to interview for both positions. That said, just because Moreno was qualified for the position, does not indicate that the other

8

candidates were not qualified as well. The Court will address this argument further in a subsequent part of this Order.

On this issue, however, it is clear that NASA brought forth a legitimate, nondiscriminatory reason for not selecting Moreno for the MPE position. As such, the Court finds that Defendant has met its burden as to this position.

### 2. *MIA Position*

Like the MPE position, the Panel sought to fill the MIA position with an individual who demonstrated technical experience and effective communication, negotiation, and team building skills. (*See* DiGiuseppe Decl., Doc. No. 23-1 at 4). Defendant chose Nujoud Merancy ("Merancy") for the MIA position. Merancy is a female. Her age and ethnicity were not denoted by either party.

With respect to technical skills, Jermstad testified that Merancy, unlike Moreno, had experience in "actually performing" the detailed technical analysis activities that the position required. (Jermstad Dec., Doc. 23-2 at 4). In Jermstad's deposition, he states, "[f]rom an analysis perspective, [Merancy] was technically stronger because she had participated closer to actually doing analysis work as opposed to just scheduling and integrating the analysis work." (Jermstad Dep., 26-2 at 107:2-6). Similarly, DiGiuseppe stated that Moreno did not have the extensive mission analysis experience with flight trajectories and consumable management that Merancy had. (DiGiuseppe Decl., Doc. No. 23-1 at 6).

Considering communication and teambuilding skills, all three panelists were more impressed with Merancy's team building approach and communication skills. (DiGiuseppe Decl., Doc. No. 23-1 at 4–5; Jermstad Dec., Doc. 23-2 at 4; Sarafin Dec., Doc. No. 23-3 at 4–5). During the interview, Ms. Merancy provided the Panel with specific examples from her work history of how she built a team using her soft skills and explained how she used her influence and leadership

skills to navigate her teams through difficult situations. (Sarafin Dec., Doc. No. 23-3 at 4–5). Conversely, according to Sarafin, Moreno's interview "response was inwardly focused and not outwardly focused on team skills and work related relations with others." (Sarafin Dec., Doc. No. 23-3 at 5). After balancing the strengths and weaknesses of each candidate, the Panelist's "recommendation for … Ms. Merancy to be selected or Mission Integration and Analysis… was unanimous." (Sarafin Dec., Doc. No. 23-3 at 5). Consequently, Merancy was selected for the position. (DiGiuseppe Decl., Doc. No. 23-1 at 6).

In response, Plaintiff again argues that NASA "failed to provide specific, clear, and individualized explanation for why its selecting official assigned her respective ratings or scores." (Doc. No. 26 at 6). In support of his contention, Plaintiff points to a case from the Eleventh Circuit. In *Steger v. General Electric Company*, that court stated that "[a] defendant may not merely state that the employment decision was based on the hiring of the 'best qualified' applicant, but must articulate specific reasons for that applicant's qualifications such as 'seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination' of such criteria." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003). This Court notes the Fifth Circuit has reached the same conclusion. As the Fifth Circuit explains, "[w]ithout evidence of the candidates' relative qualifications, the mere assertion that [the employer] hired the best qualified candidates is insufficient to satisfy its burden of production" on the legitimate non-discriminatory reason prong. *Alvarado v. Texas Rangers*, 492 F.3d 605, 618 (5th Cir. 2007). In this case, NASA not only stated that the selected candidates were the best qualified, but, as discussed above, also explained the exact reasons why Merancy and Shull were its top choices. As such, the Court finds that Defendant has met its burden to provide a

10

legitimate, non-discriminatory reason for not choosing Moreno, and moves to the third prong of the *McDonnell Douglas* analysis.

## C.      Plaintiff's Pretext Contentions

In step three of the *McDonnell Douglas* analysis, Moreno must bring forth evidence to establish a genuine issue of material fact that Defendant's legitimate reason is a pretext. Defendant argues that Moreno cannot meet his burden to demonstrate that its legitimate, nondiscriminatory reasons for hiring Shull and Merancy over Moreno were pretextual or that Moreno's race, color, sex, national origin, or age played a role in its selections. (Doc. No. 23 at 10). Moreno disagrees.

Once the employer satisfies its burden of providing a legitimate, nondiscriminatory reason for the employment decision:

> [T]he onus shifts back to the plaintiff to prove either that the defendant's articulated reason is merely a pretext for race [color, sex, national origin, or age] discrimination, or that the defendant's reason, while true, is only one of the reasons for its decision, and another 'motivating factor' is the plaintiff's protected characteristic (the mixed-motives alternative).

*Autrey*, 704 F.3d at 347. Neither party offers much, if any, argument (and certainly no evidence) as to the mixed-motives alternative, so the Court will focus its analysis on the pretext alternative.

The plaintiff "must substantiate his claim or pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). "A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated [his or her] employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013); *see also Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 578 (5th Cir. 2020) ("Pretext can be proven by any evidence

that casts doubt on the credence of the employer's proffered justification for the adverse employment action.").

The Fifth Circuit, however, has held some evidence that may be interpreted as evidence of pretext does not preclude summary judgment if that evidence does not raise a "legitimate fact issue as to discriminatory intent." *See Churchill v. Tex. Dept. of Crim. Just.*, 539 F. App'x 315, 320 (5th Cir. 2013). "While [the plaintiff] presented some evidence of pretext, our careful review of the record, viewed in the light most favorable to [the plaintiff's] claim, compels the conclusion that the evidence taken together does not raise a legitimate fact issue as to discriminatory intent." *Id. See also Reeves*, 530 U.S. at 148 (explaining that although a plaintiff may set forth evidence to reject an employer's proffered legitimate, nondiscriminatory explanation as pretextual, the case may still present a circumstance where "no rational fact finder could conclude that the action was discriminatory"). The Plaintiff's evidence must be "so persuasive so as to support an inference that the real reason was discrimination." *Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000).

To prove pretext in a failure-to-promote case, a plaintiff may show either (1) that the employer's proffered explanation "is false or unworthy of credence" or (2) that the plaintiff is "clearly better qualified than the person selected for the position." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 (5th Cir. 2007). Here, the Plaintiff claims both apply.

## *1. Were Defendant's Proffered Reasons False or Unworthy of Credence?*

"If the plaintiff can show the employer's asserted justification is false, this showing, coupled with a prima facie case, may permit the trier of fact to conclude that the employer discriminated against the plaintiff without additional evidence." *Price*, 283 F.3d at 720. "An employer's explanation is false or unworthy of credence if it is not the real reason for the

12

employment action." *Burrell*, 482 F.3d at 412. That said, there are cases where even showing that the defendant's asserted reason is false is not sufficient to overcome a summary judgment motion. *Price*, 283 F.3d at 720 ("There will be cases where a plaintiff has both established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, yet "no rational factfinder could conclude that the action was discriminatory."). For that reason, whether summary judgment is proper depends on many factors, including the strength of the plaintiff's prima facie case, the probative value of the evidence that the employer's explanation is false, and all other evidence that supports the employer's case and may properly be considered. *Id.*

NASA argues that it "had a litany of reasons why the Panel selected Shull and Merancy over the Plaintiff, and none of those reasons have anything to do with Plaintiff's race, color, sex, national origin, or age." (Doc. No. 23 at 14).

Moreno offers two arguments in response. Moreno first argues that the decisionmakers relied solely on subjective assessments of the interviewee's performance, which is a pretext for discrimination. Second, Moreno asserts that Defendant failure to follow its employment policy to rank or rate all applicants is evidence of pretext. The Court will consider each of Moreno's arguments.

**A. Subjective Assessment**

Moreno argues that Defendant's subjective "criteria itself may be pretext for discrimination," making summary judgment inappropriate. (Doc. No. 26 at 8). Moreno is not the first plaintiff to make this argument. *See Gregory v. Town of Verona*, Miss., 574 F. App'x 525 (5th Cir. 2014) (plaintiff argued that the employers reasoning that the chosen candidate was more qualified and possessed better leadership skills automatically established a fact issue); *Rowe v. Jewell*, 88 F. Supp. 3d 647 (E.D. La. 2015) (employee contends that employer's reliance on

"subjective criteria [such as leadership skills] automatically establishes a fact issue, making summary judgment inappropriate").

The Fifth Circuit's stance on this subject, however, is clear. "An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection." *Alvarado v. Texas Rangers*, 492 F.3d 605, 616 (5th Cir. 2007), *citing Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) ("It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation."). An employer can rely on subjective reasons to select one candidate over another, "such as a subjective assessment of the candidate's performance in an interview." *Martinez v. Texas Workforce Comm'n-C.R. Div.*, 775 F.3d 685, 688 (5th Cir. 2014). "The mere fact that an employer uses subjective criteria is not, however, sufficient evidence of pretext." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 882 (5th Cir. 2003), *citing Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176 (7th Cir.2002) (observing that " '[a]bsent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII' ") (*quoting Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir.2001)).

The Panelists undoubtedly considered "subjective" criteria. Namely, the Panelists considered communication skills as well as negotiation and team influence capabilities. (DiGiuseppe Decl., Doc. No. 23-1 at 4). The job description required the Panelists to consider these criteria since NASA was looking for candidates "who demonstrated (1) technical competencies in Human Spaceflight Operations, Mission Integration, and experience with the

14

Exploration System Development (ESD) Exploration Missions; and (2) *effective communication, negotiation and team building skills*." (DiGiuseppe Decl., Doc. No. 23-1 at 2) (emphasis added). NASA specifically outlined the reasons that it ranked Shull and Merancy's subjective attributes surpassed Moreno's. The Court concludes that the subjective assessment may serve as a legitimate, non-discriminatory reason for the employer's decisions, and that the evidence relief upon by the Plaintiff, without more, is not evidence of pretext. *Martinez*, 775 F.3d at 688 ("Because the TWC has provided some evidence demonstrating how it scored the applicants in the interview process, we conclude that the subjective assessment may serve as a legitimate, non-discriminatory reason for its decision, and the use of the subjective assessment does not serve as evidence of pretext.").

The Court further notes that absent an objective test, like the SAT, even a comparison of the technical skills of two candidates at some level involves a degree of subjectivity.[5] As previously discussed, NASA specially described how each Panelist arrived at the decision that Merancy and Shull were better qualified than Moreno.[6] The Court finds, in this regard, that Plaintiff has met not met his burden of raising a fact issue that Defendant's proffered reason was merely pretext.

## B. *Failure to Follow Policy*

Moreno contends that NASA's hiring process involved an unexplained deviation from its ranking process and that this deviation is evidence of pretext. (*See* Doc. No. 26 at 9). NASA maintains a policy that outlines a process for ranking job applicants. As explained, "[t]he ranking process is intended to identify the relative degree to which qualified applicants possess the specified skill or competencies." (Doc. 26-6). Once an applicant meets the minimum qualification

---

[5] Of course, the use of objective tests, like the SAT, have also come under fire.
[6] For example, Sarafin provided an example of how Ms. Merancy provided the Panel with specific examples from her work history of how she built a team using her soft skills and explained how she used her influence leadership skills to navigate her teams through difficult situations. (Sarafin Dec., Doc. No. 23-3 at 4–5). Additionally, the Panelists shared that Shull discussed discuss the relational aspects of working with teams while Moreno did not. One of the Panelists even went as far to say that "Mr. Moreno is very directive/blunt in his communication style versus soliciting input, listening, and consensus building." (DiGiuseppe Decl., Doc. No. 23-1 at 4)."

of the position, they are to be "rated against job-related criteria." (Doc. 26-6). The policy, however, does not apply to all hiring decisions. Instead, the policy explicitly states, "[t]he HR specialist may waive the normal ranking process if there are ten or fewer qualified applicants at a given grade level and document such decision in the staffing case file." (Doc. 26-6).

For the MPE and MIA positions, the Human Resources Department provided DiGiuseppe with two certificates: one with ten eligible candidates for the MIA position and an even shorter list of candidates for the MPE position. (DiGiuseppe Decl., Doc. No. 23-1 at 2). Each list was then narrowed to three candidates to be interviewed for each position. (DiGiuseppe Decl., Doc. No. 23-1 at 2). Both positions clearly involved ten or fewer candidates for each position, so according to the protocol the normal ranking process was not mandatory and need not be followed. (*See* Jermstad Dep., 26-2 at 105:9-14).[7]

Even if the Policy did apply, and the Panel should have formally ranked the candidates in accordance with the policy, Moreno has not demonstrated a nexus between NASA's failure to utilize the ranking policy and the alleged discrimination in failing to promote him. The Fifth Circuit has stated that an employer's "disregard of its own hiring system does not of itself conclusively establish that improper discrimination occurred or that a nondiscriminatory explanation for an action is pretextual." *E.E.O.C. v. Texas Instruments Inc.*, 100 F.3d 1173, 1182 (5th Cir. 1996). Rather, to make out a discrimination claim, "the plaintiff must establish some nexus between the employment actions taken by the employer and the employee's [protected class]." *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 819 (5th Cir.). Plaintiff has provided no such evidence. For those

---

[7] In his deposition, Jermstad is asked whether the panelists' failure to rank was "a violation of Nasa's selection process?" (Jermstad Dep., 26-2 at 105:11-12). In Response, Jermstad states "[n]o. I believe it's still – this other exhibit here with the 'ten or fewer qualified.'" (Jermstad Dep., 26-2 at 105:13-14). He is then asked, "[y]ou're saying that gives you an exception to rank anyone?" (Jermstad Dep., 26-2 at 105:19-20). To which he responds, "[t]hat's my interpretation." (Jermstad Dep., 26-2 at 105:21).

16

reasons, the Court concludes that NASA's failure to follow an inapplicable ranking policy does not constitute evidence of pretext.

In sum, Moreno does not provide evidence that the Panel's reasons for selecting Shull and Merancy were false or not credible. Similar to the record in *Shater v. Shell Oil*, Moreno has no evidence of pretext or discriminatory motive. *See Shater v. Shell Oil Co.*, No. 4:20-CV-1465, 2022 WL 2183133 (S.D. Tex. May 31, 2022) (concluding that an employee's claims that the chosen candidate was preselected, unsupported by any direct evidence, did not establish pretext). Rather, Moreno's "arguments are speculative and conclusory at best." *Shater v. Shell Oil Co.*, No. 22-20289, 2022 WL 17250190, at *2 (5th Cir. Nov. 28, 2022). More importantly, there is no evidence of discriminatory animus, and Moreno does not meet its burden of establishing that Defendant's legitimate, non-discriminatory reason is merely a pretext.

## 2. *Was Moreno clearly better qualified than Shull and Merancy?*

The second way a plaintiff can establish pretext is by demonstrating that he or she was "clearly more qualified" than the other candidates. *Martinez v. Texas Workforce Comm'n–Civil Rights Div.*, 775 F.3d 685, 687 (5th Cir. 2014). Specifically, the plaintiff must show that "he was 'clearly better qualified' such that 'the qualifications are so widely disparate that no reasonable employer would have made the same decision.'" *Martinez v. Texas Workforce Comm'n–Civil Rights Div.*, 775 F.3d 685, 687 (5th Cir. 2014) (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010) (further explaining that "the bar is set high for this kind of evidence") (cleaned up)). Mere proof that two candidates are similarly qualified does not establish pretext. *Price*, 283 F.3d at 723.

Moreno does not devote much argument to this point. That said, Moreno does claim that he previously performed duties that matched the GS-15 job requirements. He also points out that

17

he received a "distinguished" rating on his performance evaluation just before applying for the position, which, he concludes, is "a strong indication that the duties he was performing that matched the job announcement for the positions were performed at the highest level." (Doc. 26 at 7). While these facts might indicate why he was chosen to interview, none of this evidence demonstrates that Moreno was "clearly better qualified" than the other candidates; it merely shows that he met the required minimum qualifications, which does not meet the bar set for this inquiry.

In another part of his Motion, Plaintiff also claims that Defendant "overlook[ed] or downplay[ed] the fact that Moreno successfully performed some of the job duties of the position in dispute. Shull and Merancy had not." (Doc. No. 26 at 8). These contentions, however, are not supported by evidence. (*See* Doc. No. 26 at 8).[8]

Even setting aside the evidence that demonstrates Shull and Merancy's superior subjective qualifications, the record concerning the relevant "objective" criteria between the candidates is comparable. As to the MPE position, the evidence shows that Shull was equally, if not more, qualified as Moreno.[9] The evidence concerning the MIA position is the same. According to the admissible evidence, Merancy was at least as qualified, if not better qualified, than Moreno for the MIA position.[10]

---

[8] In his Motion, Moreno makes many assertions that are not supported by citations to any evidence. (*See e.g.*, Doc. No. 26 at 8) (Defendant "overlook[ed] or downplay[ed] the fact that Moreno successfully performed some of the job duties of the position in dispute. Shull and Merancy had not." It is the responsibility of the parties, however, to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara*, 353 F.3d at 405. It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

[9] All of the interview panelists agree that Moreno and Shull maintained comparable technical competencies. (DiGiuseppe Decl., Doc. No. 23-1 at 3); (Jermstad Dec., Doc. 23-2 at 3); (Sarafin Dec., Doc. No. 23-3 at 4). One panelist even stated that Moreno did not demonstrate as diverse a work experience as Shull, which she highlighted by describing her past work experiences and projects. (Sarafin Dec., Doc. No. 23-3 at 4).

[10] In his declaration one of the Panelists stated that Merancy, unlike Moreno, had experience in "actually performing" the detailed technical analysis activities. (Jermstad Dec., Doc. 23-2 at 4). Similarly, DiGiuseppe stated that Moreno did not have the extensive mission analysis experience with flight trajectories and consumable management that Merancy had. (DiGiuseppe Decl., Doc. No. 23-1 at 6).

### C. *Discriminatory Intent*

While not a step to be specifically analyzed in the *McDonnell Douglas* formula, this Court notes that the record, as a whole, does not raise an issue of material fact as to discriminatory animus or intent. When viewed in its entirety the closest Moreno gets to presenting such evidence is his own declaration. In that declaration he states, "I have not seen a Hispanic/Mexican-American hold a grade GS-15 or higher position" (Moreno Decl., Doc. No. 26-4 at 1). He also says, "[t]o my knowledge, Ms. DiGiuseppe's organization has no Hispanics that hold a GS-15 or higher position." (Moreno Decl., Doc. No. 26-4 at 1). Moreno's statements that he "has not *seen* a Hispanic/Mexican-American" and that he does not have "*knowledge*" of any Hispanics in a GS-15 position does not raise such a fact issue.

Additionally, Moreno claims that "DiGiuseppe discouraged [him] from applying for the position." (Moreno Decl., Doc. No. 26-4 at 1). While DiGiuseppe denies making that statement, there is no evidence that DiGiuseppe discouraged Moreno from applying based on his race, color, sex, national origin, or age. Therefore, this evidence does not raise a fact issue as to discriminatory intent either.

Considering the admissible summary judgment evidence, the Court concludes that Moreno has failed to present evidence from which a reasonable factfinder could find that NASA's proffered reasons are merely pretextual. *See Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000) (upholding a trial court's grant of summary judgment in favor of the employer despite the fact that the plaintiff put forth some evidence of pretext, concluding that the university's proffered reasons—that the plaintiff was a poor teacher and inactive university citizen—combined with the "overall lack of any evidence of discriminatory intent," were sufficient to defeat the plaintiff's claim).

The Court finds that Plaintiff's proffered evidence of pretext does not raise a legitimate fact issue as to discriminatory intent, and **GRANTS** NASA's Motion for Summary Judgment.

### IV. Conclusion

The Court finds no direct evidence of discrimination or discriminatory animus of any kind, nor does it find any circumstantial evidence of such discrimination. Finally, it finds that the Plaintiff did not meet his burden of raising a material issue of fact as to pretext. For the foregoing reasons, the Court hereby **GRANTS** NASA's Motion for Summary Judgment. (Doc. No. 21).

Signed at Houston, Texas, this   12   day of December, 2022.

Andrew S. Hanen
United States District Judge